**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: March 31 2014**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 09-31449 |
| | ) | |
| Daniel Roger Asbury and | ) | Chapter 7 |
| Michelle Lynn Asbury, | ) | |
| | ) | Adv. Pro. No. 12-3082 |
| Debtors. | ) | |
| | ) | Hon. Mary Ann Whipple |
| Louis J. Yoppolo, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Daniel Roger Asbury, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiff's amended complaint to determine the dischargeability of a debt allegedly owed by Defendants. Defendants (jointly, "the Asburys") are debtors in the underlying Chapter 7 case. Plaintiff is the Chapter 7 Trustee of the bankruptcy estate of Marilyn S. Wilson, Case No. 12-30065. He commenced this proceeding as successor to her interest in property included in the estate. Plaintiff alleges that a debt owed to Wilson by Defendants is nondischargeable under 11 U.S.C. § 523(a)(3)(B).

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising in a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United

States District Court for the Northern District of Ohio.  Proceedings to determine the dischargeability of debts are core proceedings that the court may hear and decide.  28 U.S.C. § 157(b)(1) and (b)(2)(I).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case.  Based upon that review, and for the reasons discussed below, the court finds that the Asburys are entitled to judgment in their favor.

## FINDINGS OF FACT

This adversary proceeding arises out of circumstances in connection with a Land Installment Contract ("Land Contract") between Wilson and Defendant Daniel R. Asbury ("Asbury").  In the spring of 2004, Wilson lived in a home located at 2701 State Route 598, New Haven, Ohio ("Wilson's home" or "the Property").  She and her husband, then deceased, had built the home, and she had lived there for approximately twenty years.  Wilson testified that after her husband's death and while she was "sorting out" her life, she was not making payments on the mortgage held by Countrywide Home Loans, Inc. ("Countrywide"), that was secured by Wilson's home, and the mortgage was foreclosed upon.

By spring of 2004, Countrywide owned Wilson's home and sent real estate broker Patrick Spettel ("Spettel") to determine whether it was occupied.  Wilson told Spettel that she wanted to buy her home back from Countrywide.   On May 21, 2004, Wilson submitted a written offer to Countrywide to purchase the Property for $155,000, with a $110,000 down payment. [*See* Pl. Ex. 5].  The down payment was to be obtained by Wilson after closing on a pending sale of other property that she owned on State Route 598. However, Countrywide rejected her offer.

Spettel then put Wilson in contact with HCMS Home Loans LLC ("HCMS"), established in February 2004 and owned by Asbury's wife, Defendant Michelle Asbury, who was also president of the company. [*See* Pl. Ex. 1].  Michelle Asbury's prior employment included employment as a mortgage loan originator and account executive and manager, with responsibilities that included pricing loans, processing loans, and closing and post-closing duties. [*See* Pl. Ex. 4, p. 7].  Asbury was the registered agent and a loan officer for HCMS.  [*See* Pl. Ex. 1, p. 2].  He had worked as a loan officer at various mortgage companies and banks since 1993.

Wilson initially met with another loan officer at HCMS and applied for a $45,000 mortgage loan. Wilson testified that she met with the loan officer several times but eventually was told that he could not get her approved for a loan.  The loan officer then suggested that she meet with Asbury and that he perhaps

2

could help her purchase the property by land contract. Wilson met with Asbury, and on June 2, 2004, she signed a purchase contract, offering to purchase the Property from the Seller for $155,900, with $1,000 to be deposited as earnest money and $109,000, later amended to $110,000, to be deposited in escrow at Huron County Title Agency, in which Asbury was a shareholder. [Pl. Exs. 6 & 11]. The purchase contract was signed on June 14, 2004, by Asbury and, purportedly, Michelle Asbury, accepting Wilson's offer, contingent upon the Asburys being able to purchase the Property from Countrywide and obtaining clear title. [*Id.* at pp. 5-6]. As Wilson had closed on the sale of the other property she owned on State Route 598, a bank check remitted by her and made payable to Huron County Title Agency LLC was issued on June 12, 2004, in the amount of $110,000 and was deposited in escrow at the title agency.

Thereafter, the Asburys obtained title to the Property pursuant to the purchase of the Property from Countrywide for $147,000. [*See* Pl. Ex. 12]. Countrywide executed a deed to the Property in favor of the Asburys on June 25, 2004. [Doc. # 8]. On July 6, 2004, Asbury and, purportedly, Michelle Asbury, executed a 30-year mortgage against the Property in favor of HCMS as security for a note in the amount of $102,900. [Doc. # 9]. That mortgage was immediately transferred to Flagstar Bank. Michelle Asbury testified that she signed neither the June 14 purchase contract nor the mortgage. She further testified that her husband had permission to sign her name in some circumstances; however, she did not recall if that was the case as to these two documents. In any event, she has not otherwise challenged the validity of either document.

On July 6, 2004, after execution of the HCMS/Flagstar mortgage, Wilson, as purchaser, and Asbury, as vendor, executed the Land Contract for the sale of the Property to Wilson.[1] [*See* Pl. Ex. 10]. The Land Contract was prepared by Wilson's attorney in accordance with the terms provided to him by Wilson. He had no other involvement in the transaction. Paragraph 2 of the Land Contract is entitled "Existing Mortgages and Other Encumbrances" and provides that the premises are subject to a mortgage to an unidentified entity "to secure repayment of the original principal sum of fourty (sic) nine thousand six hundred dollars ($49,600)." [Pl. Ex. 10, ¶ 2]. Pursuant to the Land Contract and Addendum to Land Contract, Wilson agreed to pay to Asbury a down payment of $110,000 plus $3,500 in costs and the principal sum of $49,600 financed at 8.5%, plus interest, taxes and insurance, payable monthly in the amount of $548.62, with a balloon payment due on July 1, 2010. [Pl. Ex. 10 & 11]. Other relevant provisions include the requirement that Asbury cause a copy of the Land Contract to be recorded in the office of the Recorder of Huron County and that, in the event of any subsequent mortgage or encumbrance,

---

[1] Although the Land Contract states that it was signed by Asbury and Wilson on July 6, 2004, their signatures were acknowledged before a notary on July 7, 2004. [*See* Pl. Ex. 10, p. 4].

Wilson, at her option, "shall have the right to make all further payments required under this Agreement to the holder of the mortgage or encumbrance until the same is fully discharged." [Pl. Ex. 10, ¶¶ 11 & 12].

Michelle Asbury testified that she was aware of the Land Contract before it was signed; however, she did not sign it and testified credibly that she was not aware of the terms of the contract. Although the HCMS Mortgage was recorded in the Huron County Recorder's office, the Land Contract was never recorded.

There is no dispute that Wilson was never informed that a mortgage against the Property in the amount of $102,900 had been granted by the Asburys before the Land Contract was executed. According to Asbury, the amount of his mortgage was never discussed with Wilson. Wilson testified that she understood at the time of the transactions at issue that Asbury would use the $110,000 that she had paid into escrow and that constituted her down payment on the Land Contract as Asbury's down payment to Countrywide and that he would then borrow the balance that would be owed by him to Countrywide. However, that is not the manner in which Asbury completed his purchase of the Property, notwithstanding his testimony that he understood Wilson's payments to him under the Land Contract would create in her an interest in the Property.

Asbury testified that the $102,900 that was obtained pursuant to a loan that was the subject of the HCMS/Flagstar mortgage was paid to Countrywide towards the purchase of the Property. He further testified that the $110,000 previously paid into escrow by Wilson was disbursed, at least in part, as payment of the balance owed with respect to his purchase of the Property – i.e., the amount representing Asbury's down payment and the closing costs relating to the purchase. Thus, $44,100 ($147,000 purchase price minus $102,900) plus the closing costs were paid from the $110,000. Although Asbury testified that he did not recall to whom the balance of the $110,000 was disbursed, the court credits the testimony of Nancy Snyder, closing agent for the transaction, that the balance was disbursed by her to Asbury. While the amount of the closing costs is not in evidence, Asbury received $65,900 ($110,000 minus $44,100) less the closing costs as a disbursement from the escrowed funds.

After execution of the Land Contract, Wilson made regular monthly payments to Asbury, generally by hand delivering them to his place of business. She did not, however, receive annual statements regarding application of those payments and the balance due on the Land Contract.

On March 13, 2009, the Asburys filed for relief under Chapter 7 of the Bankruptcy Code. The first date set for the meeting of creditors was May 12, 2009, and the last day to file a complaint to determine

dischargeability of a debt under 11 U.S.C. § 523(c) was July 13, 2009. [Case No. 09-31449, Doc. # 8]. [2] The Asburys scheduled Wilson's home on bankruptcy Schedule A as "rental property" with a value of $95,000. [Pl. Ex. 16, p. 11]. The Asburys's Schedule D, Creditors Holding Secured Claims, shows a mortgage against the Property held by Chase in the amount of $97,827 on the date of filing. [*Id.* at 25]. Asbury testified that he had refinanced the Property with Chase some time before filing for bankruptcy. Wilson, however, was not scheduled as a creditor, nor was the Land Contract scheduled as an executory contract. As such, it is undisputed that Wilson never received formal notice of the Asbury's bankruptcy filing. The parties offer conflicting testimony regarding Wilson's receipt of informal notice of the filing.

According to Asbury, he told Wilson that he was in bankruptcy at some time during the pendency of his bankruptcy case. Initially, he testified that Wilson was told about the bankruptcy when she brought him a notice from Chase that she had received at her address stating that his mortgage payments were late and that she was told at that time that he was trying to reaffirm the Chase debt. Later, when asked regarding the circumstances when Wilson was told of his bankruptcy, Asbury testified that Wilson had come to his mortgage office and they were talking about the Property in general. Although he does not remember exactly when or even what month she came to his office, his case was pending between March and September of 2009. Asbury testified that after September 2009, he operated a car lot at the former location of his mortgage office and Wilson never came to the car lot. He testified that she then began mailing him her Land Contract payments.

This testimony, however, is inconsistent with Asbury's testimony regarding Spettel's request in February 2011 of him that the parties release the $1,000 earnest money that was still being held by ReMax. Asbury testified that in February 2011, Wilson came to his office to make a payment, at which time he called Spettel, who then brought the release over to be signed. That release was in fact executed by both Asbury and Wilson on February 16, 2011. [Pl. Ex. 18].

The court finds more credible and credits Wilson's testimony regarding her continued contact with Asbury and how and when she ultimately was told that Asbury was in bankruptcy. Wilson testified that, at some time in 2009, she told Asbury that she'd like to get the Property in her name because she was paying 8.5% interest and interest rates were dropping. On February 2, 2010, Wilson and Asbury signed an agreement extending the terms of the Land Contract to July 1, 2015, after Wilson had contacted Asbury regarding her concern that the terms of the Land Contract would expire on July 1, 2010. [Pl. Ex. 17].

---

[2] The court takes judicial notice of the contents of its case docket. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (6th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it).

Wilson had begun contacting mortgage companies regarding financing a payoff of the Land Contract in January 2010.

She testified that she was ultimately approved for a loan and had a closing date set for June 28, 2010. She testified that during the process of obtaining loan approval, she had received a notice on the gate at her home that was addressed to Asbury and that stated he was $1,000 behind in his mortgage payment. She was advised by the mortgage company with whom she was dealing to take the notice to Asbury. She testified that when she did, Asbury told her, "I'll take care of it." Wilson further testified that approximately two weeks before her scheduled closing, Asbury had not provided a payoff when such was requested by the mortgage company. Asbury admitted having been contacted by a mortgage company for a payoff and not providing it. Wilson testified that she went to Asbury's office and told him she had a closing scheduled but needed a payoff amount. Asbury told her it was "a terrible time" and that he "[could] not do it now" because he was in bankruptcy. The closing therefore did not take place. Wilson testified that had the closing taken place, her monthly mortgage payments would have been $150 less than her payments under the Land Contract.

Wilson continued to make her monthly payments to Asbury. At some time, however, Asbury stopped making his mortgage payments to Chase and a foreclosure action was filed and was pending at the time of this trial.

Wilson filed her own Chapter 7 petition on January 9, 2012. [*See* Pl. Ex. 20]. Plaintiff was appointed the Trustee in her case. Plaintiff did not initially include a claim against the Asburys in her bankruptcy schedules. [*See id.* at Schedule B, pp. 14-17]. However, her claims against the Asbury are included in her amended Schedule B filed on September 21, 2012. [Case No. 12-30065, Doc. # 61, p. 6/8].

## LAW AND ANALYSIS

Plaintiff seeks a nondischargeability determination regarding a debt allegedly owed to Wilson by the Asburys as a result of the mortgage granted by them immediately before execution of the Land Contract in an amount more than twice the principal amount owed by Wilson under the Land Contract. According to Plaintiff, the debt is nondischargeable under § 523(a)(3)(B) as a debt of a kind specified in subsections 523(a)(2), (4) or (6).

Generally, a complaint to determine the dischargeability of a debt under § 523(a)(2), (4) or (6) must be filed no later than sixty days after the first date set for the meeting of creditors, unless the court extends the time for cause on motion of a party in interest. *See* Fed. R. Bankr. P. 4007(c). Creditors are entitled to "no less than thirty days notice of the time so fixed." *Id.* If a complaint is not filed before the deadline set forth in Rule 4007(c), the debt is discharged. *See id.*; 11 U.S.C. § 523(c). An exception to this rule exists

6

and the debt is not discharged if the "debt is of a kind specified in § 523(a)(2), (4), or (6)" and was not listed or scheduled by the debtor as required under § 521(a)(1) in time to permit the timely filing of a proof of claim and request for a determination of dischargeability, "unless  [the] creditor had notice or actual knowledge of the case in time for such timely filing and request."  11 U.S.C. § 523(a)(3)(B).

Similarly, under the Bankruptcy Act, a discharge "' release[d] a bankrupt from all of his provable debts, except such as *** (3) ha[d] not been duly scheduled in time for proof and allowance, with the name of the creditor if known to the bankrupt, unless such creditor had notice or actual knowledge of the proceedings in bankruptcy.'" *Hill v. Smith*, 260 U.S. 592, 594-95 (1923).  In *Hill*, the United States Supreme Court addressed the relative burdens of proof with respect to this provision as follows:

> By the very form of the law the debtor is discharged subject to an exception, and one who would bring himself within the exception must offer evidence to do so.  But there is an exception to the exception, 'unless the creditor had notice,' etc., and, by the same principle if the debtor would get the benefit of that he must offer evidence to show his right. We agree with the Court below that justice and the purpose of the section justify the technical rule that if the debtor would avoid the effect of his omission of a creditor's name from his schedules he must prove the facts upon which he relies.

*Id.* at 595.

Applying the same reasoning in this case, in order to fall within the § 523(a)(3)(B) exception to discharge, Plaintiff has the burden of showing that a debt owed to Wilson was not included in the Asburys' bankruptcy schedules such that she had no formal notice of their bankruptcy in time to file a dischargeability complaint.  In addition, Plaintiff must show that Wilson holds a debt "of a kind specified" in § 523(a)(2), (4) or (6).  Although, generally, a creditor must prove exceptions to dischargeability for individual debts under 11 U.S.C. § 523(a) by a preponderance of the evidence, *Grogan v. Garner*, 498 U.S. 279, 291 (1991); there is disagreement as to the standard of proof applicable to the "of a kind specified in § 523(a)(2), (4), or (6)" language in § 523(a)(3)(B), *Jones v. Warren Constr. (In re Jones)*, 296 B.R. 447, 450-51 (Bankr. M.D. Tenn. 2003) (setting forth three schools of thought: (1) a debtor's failure to timely schedule a creditor, preventing the creditor from receiving notice or having actual knowledge of the case, automatically excepts from discharge the creditor's claim; (2) a creditor must actually prove the merits of its claim under § 523(a)(2), (4) or (6); and (3) a creditor must only show that it has a viable or colorable claim under § 523(a)(2), (4) or (6)).

In *Jones*, the court held that a creditor must actually prove the merits of its claims under § 523(a)(2), (4), or (6) to establish a nondischargeability claim under § 523(a)(3). *Jones*, 296 at 451.  The court quoted *Waugh v. Eldridge (In re Waugh)*, 172 B.R. 31, 34 (Bankr. E.D. Ark. 1994) approvingly:

> This Court believes that the better view is to require the creditor to also demonstrate the

7

merits of the paragraph (2), (4), (6) nondischargeability action. This view is in keeping with the express terms of the statute and the policies embodied in the Bankruptcy Code. In any dischargeability proceeding, there is a strong presumption in favor of discharge and a fresh start for the honest debtor.... [E]xceptions to discharge or dischargeability will be strictly construed in favor of discharge.... [S]ection 523(a)(3)(B) does not create a separate exception for discharge merely for failure to schedule a particular creditor. Rather, the purpose of section 523(a)(3)(B) is to allow determination of dischargeability which would otherwise be barred by the time limitations of section 523(c) and Rule 4007(c), Federal Rules of Bankruptcy Procedure.... [S]ection 523(a)(3)(B) works to preserve the right to litigate the dischargeability of a debt when the creditor did not receive notice, but, at the same time, precludes that creditor from receiving a 'windfall' of nondischargeability due to a clerical error.

*Id.* at 450. The court then concluded:

Reading § 523(a)(3)(B) to include a requirement that the creditor prove the merits of the incorporated § 523(a)(2), (4) or (6) action simply states the obvious policy choice already made by Congress with respect to debtors who fail to list creditors: the short time periods and exclusive jurisdiction that a scheduled defrauded creditor faces under § 523(c) and Bankruptcy Rule 4007(c) are forfeited when the debtor fails to schedule a claim that would be nondischargeable under § 523(a)(2), (4) or (6). The debtor must live with the uncertainty of an unlimited statute of limitations with respect to omitted fraud claims.

*Id.* at 451.

This court finds the reasoning in *Jones* persuasive and concludes that a creditor must not only prove that the debt owed to him was not included in the debtor's bankruptcy schedules such that he had no formal notice of the debtor's bankruptcy in time to file a dischargeability complaint but also must prove the merits of his claim under § 523(a)(2), (4) or (6). Under the reasoning in *Hill,* the burden then shifts to the debtor to show that the creditor had "notice or actual knowledge" in time to file a dischargeability complaint, notwithstanding the fact that the creditor's debt was omitted from the debtor's bankruptcy schedules. *See Hill*, 260 U.S. at 595; *Faden v. Ins. Co. of N. Am.*, 96 F.3d 792, 795 (5th Cir. 1996).

**A. Timely Notice or Actual Knowledge**

In this case, there is no dispute that the Asburys neither listed nor scheduled Wilson or any debt owed to her in accordance with the provisions of § 521(a)(1) before they received their discharge and their bankruptcy case was closed. Plaintiff thus met his burden regarding Wilson's lack of formal notice of the Asburys' bankruptcy in time to permit her to file a timely dischargeability complaint. The Asburys, for their part, did not meet their burden of proving that Wilson nevertheless had notice or actual knowledge of their bankruptcy in time for such filing.

As discussed earlier, the court credits Wilson's testimony that she did not learn of the Asbury's bankruptcy until June 2010, when she went to Asbury's office to ask for a Land Contract payoff amount.

8

Although Asbury testified that after September 2009, Wilson made her monthly payments to him by mail and never came to his office, that testimony is inconsistent with his testimony regarding the release of the $1,000 escrow payment to Wilson when she came in to make a payment in February 2011. In any event, the last day to file a timely dischargeability complaint in the Asburys' bankruptcy case was July 13, 2009. Asbury's testimony that he did not remember exactly when he told Wilson about his bankruptcy but that it was at some time "while he was going through it" does not satisfy the Asburys' burden of proving that Wilson had actual knowledge of the bankruptcy in time to file a timely complaint, as their case was pending until September 2009. Lacking the notice or actual knowledge required under § 523(a)(3)(B), to the extent Wilson is owed a debt of a kind specified in § 523(a)(2), (4) or (6), the debt is nondischargeable.

### B. 11 U.S.C. § 523(a)(2)(A)

Under § 523(a)(2)(A), a debt is excepted from discharge to the extent that money or property was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." In order to except from discharge a debt for money or property obtained by false pretenses or false representation, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money or property through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). For purposes of § 523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983). "'False pretense' involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002)(quoting *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986)).

In addition, § 523(a)(2)(A) also addresses "actual fraud," a concept that is broader than misrepresentation. *See McClellan v. Cantrell*, 217 F.3d 890, 892-93 (7th Cir. 2000); *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud." *Vitanovich*, 259 B.R. at 877 (quoting *Gerad v. Cole (In re Cole)*, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)). A debtor's intent to defraud a creditor under § 523(a)(2)(A) is measured by a subjective

standard and must be ascertained by the totality of the circumstances of the case at hand. *Id*.; *Rembert*, 141 F.3d at 281-82. "If there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *Buckeye Retirement Co., LLC v. Kakde (In re Kakde)* 382 B.R. 411, 427 (Bankr. S.D. Ohio 2008); *ITT Final Servs. v. Szczepanski (In re Szczepanski),* 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

In this case, Plaintiff relies on several allegedly fraudulent representations at the time the Land Contract was signed. First, Asbury signed the Land Contract stating that the Property was subject to an existing mortgage in the amount of $49,600, when, in fact, the existing mortgage was in the amount of $102,900. There is no question that Asbury knew this representation was false at the time the Land Contract was signed. He signed the mortgage on the same day as and shortly before the Land Contract. He admits that the amount of the mortgage was never discussed with Wilson. Plaintiff, however, offered no testimony or evidence that Wilson relied on that representation, that is, that she would not have entered into the Land Contract had she known the actual amount of the mortgage. In fact, when asked whether she understood that Asbury was going to borrow money to purchase the Property, she responded that she "didn't think that deeply about it." [Doc. # 75, pp. 179-80]. While Asbury's mortgage was clearly a violation of Ohio law, which provides that "[n]o vendor shall hold a mortgage on property sold by a land contract in an amount greater than the balance due under the contract," Ohio Rev. Code § 5313.02(B), without proof of Wilson's reliance, Plaintiff has not met his burden of proving that the misrepresentation regarding the amount of the mortgage was fraudulent.

In signing the Land Contract, Asbury also represented that he would record the Land Contract and, on Wilson's fulfillment of her obligations under the contract, provide a "good and sufficient" general warranty deed conveying the Property to her. With respect to recording the Land Contract, the record is silent as to any reliance by Wilson on that representation, and there is no evidence that Asbury's failure to do so is the proximate cause of any loss. Although it is true that Asbury refinanced the original HSBC/Flagstar mortgage sometime after the Land Contract was signed, there is no evidence that the refinanced mortgage with Chase was in an amount greater than what was already owed by him under the original mortgage executed before the Land Contract was signed.

And although Wilson testified that she did rely on Asbury's representation at the time the Land Contract was signed that he would provide her with good title to the Property, Plaintiff has not shown by a preponderance of the evidence that Asbury intended to deceive Wilson in making that representation. Plaintiff has not shown that Asbury knew or should have known that he would not be able to deliver good title or that he acted in reckless disregard as to whether he could do so. The record is silent as to Asbury's

10

financial condition when the Land Contract was signed in 2004.  The court takes judicial notice of the fact that the housing market in northwest Ohio took a sharp downward turn in 2008.  Asbury owned a number of rental properties.  Had the housing market not plummeted, he perhaps could have sold properties or refinanced mortgages on those properties to provide funding to pay off the Chase mortgage on the Property.  In any event, the fact that he obtained a mortgage in excess of the amount owed by Wilson under the Land Contract does not alone show that Asbury's representation in 2004 was made with the intent to deceive her as to whether he intended and would be able to deliver good title.  The court does not find Asbury's later conduct, such as extending the term of the Land Contract and refusing to provide Wilson a payoff amount in 2010, persuasive evidence of his intent to deceive her at the time the Land Contract was signed.  Rather, the court finds such conduct is just as likely to simply be reflective of his financial straits at that time.

Plaintiff also alleges and argues that Asbury obtained payments by Wilson under false pretenses, impliedly false representations or actual fraud in that he accepted her payments under the Land Contract while failing to provide the statements required under Ohio Revised Code § 5313.03.  Section 5313.03 requires a land contract vendor to provide the vendee a statement at least once a year showing the amount of the vendee's payments credited to principal and interest and the balance due on the land contract. While a failure to disclose material facts, where there is a duty to disclose, may also constitute a misrepresentation under § 523(a)(2)(A), *see Citibank (South Dakota), N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1089 (9th Cir.1996)*; Rowe v. Steinberg (In re Steinberg)*, 270 B.R. 831, 835 (Bankr. W.D. Mich 2001), there is no evidence or even suggestion that Wilson's monthly payments were not properly credited.  Section 5313.03 does not  require the vendor to include in the annual statement the amount due on a mortgage against the property that is owed by him and, thus, there is no showing that the failure to provide the statements was the cause of any injury suffered by Wilson.

To the extent that Asbury owed any debt to Wilson as a result of conduct that occurred after he filed bankruptcy in February 2010, such debt is a post-petition debt.[3]  As such, the court does not further address such conduct since any resulting debt would not have been dealt with in the Asburys' Chapter 7 bankruptcy case and, thus, does not present an issue regarding nondischargeability as alleged in Plaintiff's amended complaint.  *See* 11 U.S.C. § 727(b) (providing that, unless excepted under § 523, a Chapter 7 discharge "discharges the debtor from all debts that arose *before* the date of the order for relief. . ." (emphasis added)).

Finally, there is no evidence of a misrepresentation or actual fraud on the part of Michelle Asbury.  She did not sign the Land Contract.  Although she was aware of the Land Contract, she was not aware of

---

[3]  At some point in time, Asbury stopped making his mortgage payments without informing Wilson but continued accepting her monthly Land Contract payments.  To the extent Plaintiff relies on such conduct in support of his claims in this proceeding, the record is silent as to when Asbury stopped making his payments.

11

the terms of the contract. And there is no evidence regarding any contact by her with Wilson thereafter. Her position at HCMS and her mortgage loan experience, without more, is insufficient to show an intent to defraud Wilson.

For the foregoing reasons, Plaintiff has not met his burden of proving that Wilson's bankruptcy estate holds a claim against the Asburys of a kind specified in § 523(a)(2)(A).

**C.  11 U.S.C. § 523(a)(4)**

Plaintiff also alleges that the Asburys owe a debt to Wilson's bankruptcy estate that is nondischargeable under § 523(a)(4), which excepts from a Chapter 7 discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Specifically, Plaintiff alleges that the Asburys obtained the $110,000.00 down payment and the monthly payments on the Land Contract "fraudulently and/or [in] reckless disregard of their ability to deliver good title to the subject property and, as a result, . . . by fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." [Doc. # 18, ¶ 15].

With respect to Michelle Asbury, the court again notes that she was not a party to the Land Contract. It is undisputed that Wilson's $110,000.00 down payment was delivered to Huron County Title Agency and her monthly payments were delivered to Asbury, not his wife. There is no evidence that Michelle Asbury ever received any payments under the Land Contract. Her relationship to Asbury, without more, is insufficient to find that she obtained any of the funds paid by Wilson under the Land Contract. As such, Plaintiff has not met his burden under § 523(a)(4) as to Michelle Asbury. The court, therefore, discusses nondischargeability under that section as to Asbury only.

The Sixth Circuit has adopted a narrow interpretation of "fiduciary" as used in § 523(a)(4). *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997). In order to trigger the fraud or defalcation provision in that statute, a debtor must hold funds in a trust for the benefit of a third party. *Id.* at 179. Furthermore, the types of trusts that will trigger the fraud or defalcation provision of § 523(a)(4) are "limited to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id.* at 180.

While the existence of a fiduciary relationship for purposes of § 523(a)(4) is determined by federal law, *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005), the determination of whether an express or technical trust exists is governed by state law, *Chapman v. Pomainville (In re Pomainville)*, 254 B.R. 699, 702 (Bankr. S.D. Ohio 2000); *see Capitol Indemnity. Corp. v. Interstate Agency, Inc.(In re Interstate Agency, Inc.)*, 760 F.2d 121, 124 (6th Cir. 1985). In order to establish the existence of an express trust, a plaintiff must demonstrate (1) an intent to create a trust, (2) a

12

trustee, (3) a trust res, and (4) a definite beneficiary. *Blaszak,* 397 F.3d at 391; *see Ulmer,* 129 Ohio St. at 339-340.

At trial, Plaintiff offered no testimony or argument that the Land Contract created an express trust. The Land Contract provides that Wilson pay to Asbury a $110,000.00 down payment and monthly payments of $548.62. Nothing in the contract states that Asbury must use the money paid to him for any particular purpose. Plaintiff has cited, and the court has found, no case in which a land installment contract was found to be an express trust. *Cf. Kropp v. Kropp (In re Kropp)*, Adv. No. 13-2105-CMB, 2013 WL 6712984,*5, 2013 Bankr. LEXIS 5269, *14-15 (Bankr. W.D. Pa. Dec. 18, 2013) (finding no intent to create a trust by entering into land installment contract); *Whitmore v. Kitchen (In re Kitchen)*, Adv. No. 93-3016-S, 1993 WL 13152212, *5 (Bankr. E.D. Va. Aug. 13, 1993 (same). Without the express creation of a trust, no fiduciary relationship exists for purposes of § 523(a)(4).

Plaintiff also alleges that the embezzlement or larceny prongs of § 523(a)(4) apply in this case. Embezzlement and larceny are defined and determined according to federal law. *Graphic v. Grim (In re Grim)*, 293 B.R. 156, 165-66 (Bankr. N.D. Ohio 2003). For purposes of § 523(a)(4), larceny is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." *Id.* (citing *Schreibman v. Zanetti-Gierke (In re Zanetti-Gierke),* 212 B.R. 375, 381 (Bankr. D. Kan. 1997)). Larceny in commonly understood to be synonymous with theft. *Whitmore Lake Public Schools v. CMC Telecom, Inc. (In re CMC Telecom, Inc.)*, 383 B.R. 52, 66 (Bankr. E.D. Mich. 2008). Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996). Embezzlement differs from larceny in that the embezzler's initial acquisition of the property is lawful.

At trial, Plaintiff did not specify the evidence relied upon by him to support his claim of nondischargeability based upon embezzlement or larceny but argued that the evidence supports a finding of nondischargeability as alleged in his complaint. In his amended complaint, Plaintiff alleges that Defendants obtained the $110,000.00 down payment and the continued monthly payments on the Land Contract "fraudulently and/or [in] reckless disregard of their ability to deliver good title to the subject property and, as a result, directly or indirectly, by. . . embezzlement or larceny." [Doc. # 18, ¶ 15].

Plaintiff has not met his burden of proving either larceny or embezzlement. With respect to Michelle Asbury, there is no evidence that she received any funds from Wilson. With respect to Asbury, to the extent that Plaintiff relies on allegations that he accepted the payments knowing that he could not deliver good title or in reckless disregard of his ability to do so to show that the initial acquisition of the payments made by

13

Wilson were unlawful, as discussed earlier, Plaintiff did not meet his burden of proof on that issue.

Wilson's payments were otherwise made pursuant to the Land Contract with Asbury. Although Wilson testified that it was her understanding that the $110,000 down payment would be used by Asbury toward the purchase of the Property, the record is silent as to the basis for her understanding. There is no testimony that such use was ever discussed with Asbury, and the Land Contract does not provide for any restriction on Asbury's use of Wilson's payments. The payments received by Asbury became his property. "One cannot embezzle one's own property." *Reshetar Sys., Inc. v. Thompson (In re Thompson)*, 686 F.3d 940, 947 (8th Cir. 2012). Wilson's right to gain an equitable interest in the Property as a result of making payments under the Land Contract did not defeat Asbury's ownership interest in the funds paid to him.

### D. 11 U.S.C. § 523(a)(6)

Section 523(a)(6) provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable. 11 U.S.C. § 523(a)(6). In order to be entitled to a judgment that the debt is excepted from discharge, Plaintiff must prove by a preponderance of the evidence that the injury from which the debt arises was both willful and malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999); *J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 801-2 (Bankr. N.D. Ohio 2001). A willful injury occurs when "(i) the actor desired to cause the consequences of the act or (ii) the actor believed that the given consequences of his act were substantially certain to result from the act." *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 307 (B.A.P. 6th Cir. 2004) (citing *Markowitz*, 190 F.3d at 464). Under § 523(a)(6), "'malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Id.* (citing *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)).

There is no question that Wilson suffered an injury as a result of Asbury being unable to provide her with good title due to having granted a mortgage in an amount more than twice the balance due under the Land Contract. As discussed earlier, however, the evidence does not support a finding that Asbury knew at the time he entered into the Land Contract that he later would not be able to deliver good title, or that such inability was substantially certain to result from his granting a mortgage in excess of the balance due under the Land Contract.

Plaintiff has also not met his burden of proving that any such injury suffered by Wilson was malicious. While Asbury certainly had a statutory duty to ensure that any mortgage on the Property held by him was not greater than the balance due under the Land Contract, *see* Ohio Rev. Code § 5313.02(B), the record is silent as to his awareness of the statute such that the court could find that he acted in *conscious* disregard of such duty. Asbury owned a number of properties; however, Wilson's home was the only

14

12-03082-maw    Doc 78    FILED 03/31/14    ENTERED 03/31/14 11:35:04    Page 14 of 15

property subject to a Land Contract. The record thus does not support a finding that his business dealings reveal such awareness. And to the extent that the Land Contract itself imposed a duty upon Asbury to hold a mortgage no greater than the balance due under the Contract, a breach of a contractual duty, even if done intentionally, will not independently support a finding of nondischargeability under § 523(a)(6). *Ward v. West (In re West)*, 446 B.R. 813, 817 (Bankr. N.D. Ohio 2010) (citing *Kawaauhau v. Geiger*, 523 U.S. 57 (1998)); *see Steier v. Best (In re Best)*, 109 Fed. Appx. 1, 8, 2004 WL 1544066, *6, 2004 U.S. App. LEXIS 13773, **19 (6th Cir. 2004) ("Consistent with *Geiger*, we have held that a breach of contract cannot constitute the willful and malicious injury required to trigger § 523(a)(6).").

## CONCLUSION

Plaintiff having failed to meet his burden under 11 U.S.C. § 523(a)(3), and, specifically, having failed to prove that the debt at issue is of a kind specified in § 523(a)(2), (4), or (6), judgment on the complaint will be entered in favor of the Asburys. The court will enter a separate judgment in accordance with this Memorandum of Decision.

###